**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                                    No. 99-4306

RONALD WILLIAMS,
<u>Defendant-Appellant.</u>

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CR-98-132-AMD)

Argued: June 5, 2000

Decided: September 27, 2000

Before MURNAGHAN,* WILLIAMS, and TRAXLER,
Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** James Joseph Nolan, Jr., PIERSON, PIERSON &
NOLAN, Baltimore, Maryland, for Appellant. Lisa M. Turner, Spe-
cial Assistant United States Attorney, Baltimore, Maryland, for

_____

*Judge Murnaghan heard oral argument in this case but died prior to
the time the decision was filed. The decision is filed by a quorum of the
panel pursuant to 28 U.S.C. § 46(d).

Appellee. **ON BRIEF:** Lynne A. Battaglia, United States Attorney, Donna C. Sanger, Assistant United States Attorney, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

A jury convicted Ronald Williams of one count of being a felon in possession of a firearm. On appeal, Williams alleges that his waiver of his right to counsel was not knowing or intelligent; that the district court erroneously granted defense counsel's motion to withdraw; and that the firearm should have been suppressed because police lacked probable cause to seize him. Finding no reversible error, we affirm.

I.

While on routine patrol late one evening, Baltimore City police officers Shillenn, Frechette, and Davis discovered a fire at the rear of a residential building. Shillenn testified that, based on his experience and training, the fire appeared suspicious and was possibly the result of arson. Shillenn further testified that he observed Williams standing only a few feet from the fire with a bucket in his hand and that he did not see anyone else in the vicinity.[1] Shillenn then asked Williams to step away from the fire for his own safety.

After a short period of time, Shillenn observed Williams walking away from the fire. Shillenn followed Williams to try to get some information about the fire from him. As he followed Williams, Shillenn observed a bulge in Williams's right pocket. Soon after Shillen

_____

[1] Williams, on the other hand, testified that a woman, presumably a resident of the building, asked him for help in putting out the fire.

2

approached Williams, Davis joined Shillen to participate in gathering information from Williams regarding the fire. The officers then questioned Williams about what he knew regarding the fire, where he lived, and why he was in the neighborhood at that time of night. They then asked Williams to produce identification. The identification listed a different address than the one Williams had verbally given to the officers. When faced with this inconsistency, along with the suspicious nature of the fire, the time of night (almost midnight), and Williams's unsatisfactory responses regarding his reason for being in the neighborhood, Shillenn then asked Williams if he could conduct a pat down of him.

Williams refused to allow the officers to search him and asked to speak with a supervisor. Shillenn then asked Williams if he was carrying any weapons, and Williams responded that he had a knife. As Shillenn patted Williams down, Shillenn felt a hard object in Williams's back right pants pocket. As soon as Shillenn felt the object, Williams spun around and pushed Davis in an apparent attempt to break away. The officers subdued Williams and conducted a search incident to arrest, during which they recovered a handgun from Williams's back pocket and a lock-blade knife from his right front pants pocket.**2**

On April 2, 1998, a federal grand jury indicted Williams for being a felon in possession of a firearm in violation of 18 U.S.C.A. § 922(g) (West 2000). On October 8, 1998, after conducting a hearing on the issue, the district court denied Williams's motion to suppress the firearm recovered during his arrest. Shortly before the start of trial, defense counsel sent a letter to the court stating that he wished to withdraw at Williams's request. The district court scheduled a hearing, during which it asked Williams to explain his reasons for wanting to dismiss counsel. Williams responded that he was not happy with counsel's performance at the hearing on his motion to suppress the firearm, and he felt he could do a better job on his own. Specifically,

_____

**2** Williams's version of the events surrounding his questioning was different from that of the officers. The district court, however, found that Williams's testimony lacked credibility. Because the district court's findings were not clearly erroneous, we adopt the facts as determined by the district court.

3

Williams said that counsel did not ask questions that Williams thought were important. Williams also complained that, although he was given ample opportunity to review copies of police reports, counsel did not provide him with hard copies. After an in-depth hearing, the district court allowed Williams to represent himself and granted counsel's subsequent motion to withdraw. Following a jury trial, Williams was convicted on one count of being a felon in possession of a firearm and sentenced to 188 months of imprisonment.

Williams raises several arguments on appeal. First, he argues that he did not knowingly and voluntarily waive his right to counsel and that the district court erred in failing to offer Williams substitute counsel when the court granted counsel's motion to withdraw. Second, Williams argues that the district court erred in denying his motion to suppress the firearm seized by the officers after conducting a pat-down without his consent. We address each of these issues, in turn.

II.

Williams first argues that his waiver of his right to counsel was not knowing and voluntary. He also argues that the district court erred in granting defense counsel's motion to withdraw without informing Williams that he could seek substitute counsel. Reviewing the district court's rulings for abuse of discretion, see United States v. Mullen, 32 F.3d 891, 895 (4th Cir. 1994), we conclude that the district court did not commit reversible error.

It is well settled that while the right to counsel is important, so too is the right to self-representation. See Faretta v. California, 422 U.S. 806, 817-18 (1975). Accordingly, a defendant's waiver of his right to counsel must be knowing, voluntary, and intelligent. See id. at 835-36. The district court informed Williams of the nature of the charges against him and the potential penalties he faced if convicted. The district court also strenuously advised Williams of the benefits of representation by legal counsel and the dangers of conducting his own defense. Despite the court's admonitions, Williams repeatedly asserted his right to proceed pro se. While Williams may now question the wisdom of his decision, we find that the record clearly shows

4

that the district court conducted a proper inquiry and that Williams's waiver of his right to counsel was knowing and voluntary at the time.

Williams also asserts that the district court effectively denied his right to effective assistance of counsel when it granted counsel's motion to withdraw and did not order counsel to serve in a stand-by capacity or inform Williams that he could request substitute counsel. We find Williams's arguments unpersuasive. While the Constitution guarantees an indigent defendant the right to counsel, it does not give him the absolute right to choose a particular attorney. As a result, once Williams decided he no longer wanted the services of appointed counsel, he could only demand substitute counsel upon a showing of good cause, and the decision as to whether to grant such a request lies within the district court's discretion. See Mullen, 32 F.3d at 895.

We find no abuse of that discretion here. The district court correctly concluded that the reasons given by Williams for wanting to discharge appointed counsel did not amount to "good cause." Williams's reasons simply reflected a disagreement over trial strategy and did not rise to a total breakdown in communication. We further find no error in the district court's denial of Williams's request that appointed counsel serve in a stand-by or advisory role. There is no constitutional right to such hybrid representation. See United States v. Singleton, 107 F.3d 1091, 1100-01 (4th Cir. 1997). As a result, there was nothing improper in the court's insistence that Williams choose between having appointed counsel continue to represent him or proceeding pro se. See United States v. Gallop, 838 F.2d 105, 109 (4th Cir. 1988).

III.

Finally, Williams argues that the district court erred in denying his motion to suppress the firearm recovered during the arrest. We review for clear error factual findings made at a suppression hearing, while legal conclusions are reviewed de novo. See United States v. Han, 74 F.3d 537, 540 (4th Cir. 1996). The ultimate decision concerning the reasonableness of the search or seizure, however, including whether reasonable suspicion existed, is to be reviewed de novo. See Ornelas v. United States, 517 U.S. 690, 699 (1996).

5

Generally, a police officer may not detain someone without a reasonable, articulable suspicion that criminal activity may be afoot. See Terry v. Ohio, 392 U.S. 1, 30 (1968). In determining the reasonableness of a stop, courts must look at the "totality of the circumstances." United States v. Sokolow, 490 U.S. 1, 8 (1989). Nevertheless, no seizure within the meaning of the Fourth Amendment occurs, and thus suspicion is not required, when police officers merely "ask questions of an individual, [or] ask to examine the individual's identification . . . so long as the officers do not convey a message that compliance with their requests is required." Florida v. Bostick, 501 U.S. 429, 437 (1991). The asking of such questions and an individual's response creates a consensual encounter that does "not trigger Fourth Amendment scrutiny unless it loses its consensual nature." Id. at 434. In addition, officers are free to conduct a pat down of a stopped individual when they have reason to believe that the individual may be armed and thus that their safety may be compromised. See Terry, 392 U.S. at 30.

With these principles in mind, the district court properly denied Williams's motion to suppress the firearm and upheld the validity of the officers' actions in dealing with Williams. The officers initially followed Williams only to gather information from him regarding the fire, as Williams was the only visible witness to the fire. Nothing suggests that Williams was not free to leave at this time or that he was forced to comply with the officers' request to answer questions regarding the fire. In other words, at the time of the initial questioning, no stop within the meaning of the Fourth Amendment had yet taken place.

After Williams provided the officers with his identification, which established an inconsistency regarding Williams's address, the district court properly concluded that the officers' consensual questioning of Williams became a legitimate Terry stop. As the district court held, reasonable articulable suspicion for the stop existed at this time in light of the totality of the circumstances, which included an inconsistency regarding Williams's address, the late hour, Williams's story regarding his reason for being in the neighborhood, the bulge Shillenn

6

previously had observed in Williams's pocket, and the suspicious nature of the fire.**3**

The officers then proceeded to question Williams, at which time Williams disclosed that he possessed a knife. As the district court concluded, once Williams admitted that he had a knife, the officers were justified in patting him down because they knew he was armed and thus had a valid concern for their own safety. See Terry, 392 U.S. at 30-31. When Williams reacted to Shillenn's frisk by assaulting Davis, the officers properly arrested Williams and searched him incident to the arrest. At that time, they discovered the firearm in Williams's back pocket. As a result, we agree with the district court's conclusion that both Williams and the handgun were properly seized.

IV.

In conclusion, we find that the district court did not abuse its discretion in allowing Williams to proceed pro se after he knowingly and voluntarily waived his right to counsel. Likewise, the district court did not err in denying Williams's motion to suppress the firearm because the police officers acted in accordance with applicable law when conducting both the pat down and the subsequent seizure. Accordingly, we affirm Williams's conviction and sentence.

AFFIRMED

_____

**3** We reject Williams's assertion that he only became a suspect after he refused to be searched and asked for a supervisor. The record clearly shows that the officers had certain suspicions prior to that point.

7