PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

v.

WILLIAM LEWIS BULLARD, II,

        *Defendant-Appellant.*

No. 09-5214

Appeal from the United States District Court
for the Middle District of North Carolina, at Greensboro.
Thomas D. Schroeder, District Judge.
(1:08-cr-00240-TDS-1)

Argued: March 25, 2011

Decided: May 6, 2011

Before NIEMEYER, DUNCAN, and AGEE, Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Niemeyer and Judge Agee joined.

## COUNSEL

**ARGUED:** Matthew McGavock Robinson, ROBINSON & BRANDT, PSC, Covington, Kentucky, for Appellant. Graham Tod Green, OFFICE OF THE UNITED STATES ATTORNEY, Winston-Salem, North Carolina, for Appellee.

**ON BRIEF:** John W. Stone, Jr., Acting United States Attorney, Greensboro, North Carolina, for Appellee.

---

**OPINION**

DUNCAN, Circuit Judge:

William Bullard ("Bullard") appeals his conviction and sentence for possession with intent to distribute cocaine base ("crack") under 21 U.S.C. § 841(a)-(b). Bullard challenges the district court's denial of his motion to suppress, argues that the disparities in sentencing between crack and powder cocaine offenses violate the Equal Protection and Due Process Clauses of the Constitution, and contends that the Fair Sentencing Act of 2010 ("FSA"), Pub. L. No. 111-220, 124 Stat. 2372, should be applied to him. For the reasons that follow, we affirm the district court's denial of Bullard's motion to suppress, reject his constitutional challenges, and join all of our sister circuits to have addressed the issue in holding that the FSA does not apply retroactively.

I.

A.

The following facts, which appear to be undisputed, are drawn from the testimony of Greensboro Police Department Detective Mike Montalvo ("Detective Montalvo") and the general manager of the Greensboro Extended Stay America Hotel, Tammy Parrish ("Parrish").

On March 10, 2008, James Burgess ("Burgess") checked into Room 318 of the Greensboro Extended Stay America Hotel (the "hotel"). He filled out a guest registration card indicating that he would be the sole occupant of Room 318, and initialed a statement providing that "I am aware that failure to

register all occupants and pets in above room could result in immediate termination of our stay." J.A. 75. Burgess's scheduled departure date was April 9, 2008.

The following day, March 11, Jawann Bradford ("Bradford") registered and paid for a one-night stay in Room 303 of the hotel. After checking out the following morning, Bradford returned to the hotel office and told Parrish that he had left a piece of luggage in Room 303. Parrish gave him a key to the room so that he could retrieve it.

During the afternoon of March 12, while checking to ensure that Room 303 had been satisfactorily cleaned, Parrish discovered a grocery bag underneath the bed. When she opened the bag, she smelled a strong chemical odor and identified a "[c]reamy white substance" that she took to be drugs. J.A. 68. Parrish called Greensboro police, who sent seven members of their Vice Narcotics Unit, including Detective Montalvo, to the hotel. The officers confirmed that the bag contained approximately two kilograms of cocaine.

The officers set up surveillance around the hotel and questioned all individuals in the parking lot, including three men standing by a parked car. Parrish responded negatively when asked if Bradford was in the group; she indicated that she did not recognize any of them. She did, however, identify a key taken from one of the men as the key to Room 318. The officers then allowed the men to leave the premises with the key, a decision to which Parrish later objected because none of the men was the registered occupant of Room 318. Police remained at the hotel until 7:00 pm on March 12, at which point they determined that no one was likely to return for the drugs. They left after instructing the hotel staff to notify them of anything suspicious.

The following day, March 13, Bradford returned to the hotel, entered the lobby, and approached the front desk. Parrish, who was sitting around the corner in the hotel office, rec-

ognized Bradford and motioned to the desk clerk. When Bradford noticed this communication, he told Parrish he "forgot something outside" that he needed to get. J.A. 70. As Bradford was exiting, Parrish saw him reaching down into his pocket in a move she interpreted as possibly reaching for a gun. Once Bradford left the lobby, Parrish locked the door and called 911.

Parrish then noticed a second man, later identified as Bullard, walking around the corner of the hotel from the direction of Room 318. Parrish recognized him as one of the three men questioned in the parking lot the day before.[1] Together, Bradford and Bullard tried to shove their way inside the lobby door. When the effort proved unsuccessful, they left.

Detective Montalvo and several additional officers arrived shortly thereafter and Parrish explained what had happened. She informed them of her belief that one of the men had the key to Room 318 and that Bradford might be in that room. She asked the officers to please "check the room to make sure he wasn't in that room and to have all the occupants that were in the room that weren't registered to leave [sic] the room." J.A. 76. She further explained that several guests had complained to her the day before of an unusual number of people coming and going from Room 318, that she had not seen the registered occupant since the day he checked in, and that she feared for the safety of nearby guests and hotel employees. Parrish gave Detective Montalvo the room key.

When the officers reached Room 318 they found a hand-made "Do Not Disturb" sign on the door. J.A. 85. They

---

[1]Although Parrish had not seen Bullard before March 12, she had previously spoken to him on the phone. At some point prior to the March 12 incident, Bullard had called Parrish, identified himself, and spoken to her about the possibility of changing locations from the Extended Stay America hotel at which he was then staying to the Greensboro location. However, there is no indication that Bullard ever registered as a guest at the Greensboro location.

knocked several times but no one answered, so they used their key to enter. The officers immediately noticed a "harsh chemical smell" that suggested to Detective Montalvo that the occupants "were cooking up some type of narcotic." J.A. 86. As he walked a few feet into the room, Detective Montalvo noticed what appeared to be cocaine residue and cocaine packaging equipment on a table. He testified that he then told the other officers: "Listen, let's just do a quick protective sweep of this place, lock it down. I am going to go ahead and apply for a search warrant. Make sure there are no weapons, no chemicals for us to inhale, or any booby traps, and so forth." *Id.*

The officers conducted an extensive search, looking in and around the beds and under clothing and opening a zipped suitcase, the refrigerator, and cabinets. Inside the suitcase, which Bullard later acknowledged was his,[2] officers found a child's lunchbox containing cocaine. At this point, Detective Montalvo requested back-up and positioned additional officers around the hotel, while he and another detective remained in the room.

Shortly thereafter, Bullard arrived at the hotel accompanied by his two children, ages five and two, and another man, Quinton Covington ("Covington"). The group went up to Room 318, with Bullard carrying his two-year-old and a plastic bag. When Bullard inserted the key into the lock, the detectives opened the door and announced themselves. Covington ran but was quickly apprehended. Bullard tried to run but was encumbered by his children and stopped. Officers searched him and found $2,000 of currency in his pocket and one and one-half ounces of cocaine in the plastic bag he was carrying. Once Bullard and Covington were secured in Room 318, Detective Montalvo left to obtain a search warrant for the room.

---

[2]The parties have also stipulated that Bullard had been staying in the hotel room for several nights, although he was not a registered guest.

Detective Montalvo based the search warrant application on the information he received from Parrish, the cocaine residue and packing materials he saw on the table in Room 318, and the items found on Bullard's person. The warrant application did not describe the items found in Bullard's suitcase.

Detective Montalvo obtained a search warrant and returned to the hotel to execute it. Officers found paraphernalia used to cook and package drugs and seized the approximately 300 grams of cocaine previously identified in Bullard's luggage and an additional $20,000-$25,000 of United States currency.

### B.

On July 28, 2008, Bullard was indicted on two counts of possession with intent to distribute crack in violation of 21 U.S.C. §§ 812 and 841. Count One charged Bullard with possessing approximately 47 grams of a mixture containing crack; Count Two charged Bullard with possession of approximately 332 grams of a mixture containing crack. In November 2008, Bullard filed a motion to suppress the evidence "obtained during and flowing from" the search of Room 318, arguing that the search was conducted "without a valid warrant and in the absence of any exception to the warrant requirement." J.A. 28.

After an evidentiary hearing at which Parrish and Detective Montalvo testified, the district court denied Bullard's motion to suppress. The district court based its denial of Bullard's motion on two alternative grounds: first, it determined that, as an unregistered guest occupying Room 318 in contravention of hotel policy and North Carolina law, Bullard had no legitimate expectation of privacy in Room 318 and thus could not challenge the search. Second, the district court found that even if Bullard did have a reasonable expectation of privacy in Room 318, the search did not violate his Fourth Amendment rights. Specifically, the district court found that officers reasonably relied on Parrish's consent to enter Room 318,

and, once in the room, saw evidence in plain view that supported their later application for a search warrant. The district court further explained that the constitutionality of officers' initial search of Bullard's luggage during their protective sweep of Room 318 was not relevant because the officers "did not rely on any evidence from the protective sweep to obtain the warrant." J.A. 166. The district court also found the search of Bullard's person permissible as a search incident to arrest.

Bullard entered into a plea agreement in which he pleaded conditionally guilty to Count Two of the indictment, reserving the right to appeal the denial of his motion to suppress. He was sentenced to 240 months' imprisonment, the statutory minimum for his offense. This appeal followed.

## II.

Bullard makes three arguments on appeal. He first challenges the district court's denial of his motion to suppress, contending that the search of Room 318 violated his Fourth Amendment rights. Bullard next argues that his sentence is unconstitutional because the disparities between crack and powder cocaine sentences violate equal protection and due process. Finally, Bullard claims that the FSA, which went into effect during the pendency of his appeal, should be applied retroactively. We address each argument in turn.

## A.

Bullard first challenges the district court's denial of his motion to suppress. When reviewing a district court's denial of a motion to suppress, "we review factual findings for clear error and legal determinations de novo," and view the evidence "in the light most favorable to the Government." *United States v. Green*, 599 F.3d 360, 375 (4th Cir. 2010).

## 1.

The parties first disagree over whether the district court properly concluded that Bullard lacked a legitimate expecta-

tion of privacy in Room 318. Without such an expectation, Bullard would be unable to assert a Fourth Amendment challenge to the search of that room.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Fourth Amendment rights are personal rights which . . . *may not be vicariously asserted*." *United States v. Quinn*, 475 U.S. 791, 794 (1986) (quoting *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978)) (emphasis in *Quinn*). In order to challenge a search under the Fourth Amendment, a defendant bears the burden of proving that he had a "legitimate expectation of privacy" in the invaded place. *United States v. Bynum*, 604 F.3d 161, 164 (4th Cir. 2010). For an expectation of privacy to be legitimate, it must be objectively reasonable; in other words, it must be an expectation "that society is prepared to recognize as reasonable." *Bond v. United States*, 529 U.S. 334, 338 (2000) (internal quotations omitted); *see also Doe v. Broderick*, 225 F.3d 440, 450 (4th Cir. 2000).

The government argues that the district court correctly concluded that as an unregistered hotel guest, Bullard had no legitimate expectation of privacy in Room 318. The government points to the fact that the hotel required all guests to register and that North Carolina law requires that "[a]ny person occupying any room or rooms in any lodging house or hotel shall register or cause himself to be registered where registration is required by such lodging house or hotel." N.C. Gen. Stat. § 72-30. And, it contends, even though a *registered* hotel guest clearly has a reasonable expectation of privacy in his hotel room, *see Stoner v. California*, 376 U.S. 483, 490 (1964), an unregistered guest not legitimately on hotel premises cannot enjoy the same expectation. Bullard counters by asserting that even though the hotel had a nominal "no registered guests" policy, he nevertheless had developed a reasonable expectation of privacy in Room 318 because he had stayed there for three days without anyone at the hotel object-

ing to his presence. *Cf. United States v. Kitchens*, 114 F.3d 29, 32 (4th Cir. 1997) ("A guest may still have a legitimate expectation of privacy even after his rental period has terminated, if there is a pattern or practice which would make that expectation reasonable.").

We find it unnecessary to decide, on the facts presented, whether Bullard had a reasonable expectation of privacy in Room 318. Assuming without deciding that Bullard may have had such an expectation, we conclude, for the reasons explained below, that the search of Room 318 did not violate his Fourth Amendment rights.

2.

Bullard's Fourth Amendment challenge focuses on the search of his closed luggage in Room 318, in which officers found approximately 330 grams of crack. Bullard argues that the officers' search of this luggage violated his Fourth Amendment rights and requires suppression of all the evidence later uncovered against him.

For purposes of Bullard's argument, the chronology of events leading up to the luggage search is important. Significantly, Bullard does not challenge the officers' *entry* into Room 318. He concedes that they had valid third-party consent from Parrish to enter the room and remove unregistered guests. *See United States v. Buckner*, 473 F.3d 551, 555-56 (4th Cir. 2007) (holding that officers' search was valid where they had "an objectively reasonable belief" that a third party "had authority to consent to a search"); *see also Illinois v. Rodriguez*, 497 U.S. 177, 179 (1990). This concession is ultimately fatal to Bullard's claim because, as we explain below, evidence in plain view upon the officers' entry supported their later application for a search warrant and established probable cause for Bullard's arrest.

Once the officers properly entered Room 318, the smell of narcotics was immediately apparent and drug paraphernalia as

well as what appeared to be cocaine residue were in plain view. The seizure of such obviously incriminating evidence was thus authorized by the plain view doctrine. *See United States v. Rumley*, 588 F.3d 202, 205 (4th Cir. 2009) ("Pursuant to th[e] plain-view doctrine, an officer may, without a warrant, seize incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." (internal quotations omitted)). Apparently recognizing this fact, Bullard does not challenge the admissibility of this evidence.

Bullard argues, however, that officers went beyond the scope of Parrish's consent to evict unregistered guests by searching cabinets and closed luggage. And, he reasons, this illegal search tainted the evidence later recovered from his luggage and his person, which would include all of the crack he was charged with possessing.

Opening luggage and cabinets under these circumstances appears to exceed the scope of a protective sweep, and the government at oral argument conceded as much. But such a search requires suppression only if the illegal search tainted the later recovery of the same evidence pursuant to a valid warrant.[3] *See Murray v. United States*, 487 U.S. 533, 536-37 (1988). Bullard argues that the search here tainted the officers' later recovery of cocaine from his luggage for two reasons: first, he asserts that it was improper for detectives to omit from their warrant application the fact that they had already searched Bullard's luggage and found cocaine within it; and second, he contends that detectives would not have sought a search warrant for the room absent the evidence they discovered in Bullard's luggage. Accordingly, Bullard believes that the evidence found within his luggage and the

---

[3]Bullard does not argue that the search warrant lacked probable cause to issue.

evidence found on his person incident to arrest should be excluded as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 484-88 (1963).

The government contends that the problematic search of Bullard's luggage is saved by the independent source doctrine, which provides for the admissibility of evidence if it would have been obtained even absent an illegal search. *See Murray*, 487 U.S. at 542. In *Murray*, the Supreme Court explained that to conclude that a later search conducted pursuant to a warrant was independent of an earlier, unlawful search, two findings must be made: first, that officers "did not include in their application for a warrant any recitation of [their earlier unlawful observations]"; and second, that they "would have sought a warrant" even if they had not conducted the unlawful search. *Id.* at 543; *see also United States v. Mowatt*, 513 F.3d 395, 404 (4th Cir. 2008).

The first criterion is indisputably met. Bullard agrees that officers did not include in their warrant application any of the information that they discovered during their initial search of Bullard's luggage. Although Bullard challenges the omission as deceptive, in fact this omission is critical to saving the warrant here from the taint of the earlier search. *See Murray*, 487 U.S. at 543.

The second criterion for the applicability of the independent source doctrine is also met on these facts, as the record reflects the officers' intent to seek a search warrant from the outset. When the officers approached 318, they had ample reason to suspect drug activity, based on the cocaine found in Bradford's room (Room 303) the day before, Bullard's association with Bradford on March 13 and with persons possessing a key to Room 318 the day before, and Parrish's statement that an unusual number of persons had been seen going in and out of Room 318. Upon entry into Room 318, officers saw evidence of drug activity in plain view and smelled a strong chemical odor. Detective Montalvo testified that at this point,

he told the officers accompanying him that he was planning to "go ahead and apply for a search warrant" as soon as they finished a protective sweep. J.A. 86.

On these facts, the independent source doctrine saves any overreaching during the officers' initial search of Bullard's luggage from tainting the evidence later obtained pursuant to a valid search warrant. The record reflects that the officers did not rely on any information obtained during the search of Bullard's suitcase in obtaining a search warrant, and that they intended to obtain a warrant before they found this additional evidence.

Officers' initial search of Bullard's luggage also did not taint the later search of his person incident to arrest. In order for a search incident to arrest to be valid, the arrest itself must have been supported by probable cause. *See United States v. Han*, 74 F.3d 537, 541 (4th Cir. 1996). We have defined probable cause to arrest as "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* (internal quotations omitted).

Here, the same observations that supported the officers' decision to apply for a search warrant—Room 318's harsh chemical smell, the evidence in plain view, the officers' knowledge of recent suspicious activities at the hotel, and Bullard's possession of a key to Room 318—also gave them sufficient reason to believe that Bullard had committed an offense and created probable cause for Bullard's arrest. *See, e.g.*, *United States v. Humphries*, 372 F.3d 653, 659-60 (4th Cir. 2004) (finding that strong odor of marijuana emanating from a particular man was sufficient to create probable cause for his arrest). Bullard does not contest the conclusion that once he was placed under arrest, officers properly searched his "person and the area within his immediate control." *United*

*States v. Currence*, 446 F.3d 554, 556 (4th Cir. 2006) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)). Accordingly, the search of Bullard's person was not tainted by the officers' initial search of his luggage because even without considering the evidence discovered in Bullard's luggage, officers had probable cause to arrest Bullard and properly searched him incident to his arrest.

For these reasons, we affirm the district court's denial of Bullard's motion to suppress.

## B.

Bullard next argues that his sentence is unconstitutional because the statute under which he was sentenced, 21 U.S.C. § 841(b), "is based on the inherently discriminatory disparity in punishment between crack and powder cocaine offenses, resulting in Bullard receiving a longer sentence based on his race." Appellant's Br. at 33. Under the version of § 841 in place at the time Bullard was sentenced, "one unit of cocaine base [was] equated with 100 units of cocaine powder; thus, possessing a much smaller quantity of cocaine base result[ed] in a lengthier sentence than possessing the same quantity of cocaine powder."[4] *United States v. Burgos*, 94 F.3d 849, 876 (4th Cir. 1996). Bullard argues that because these harsh crack penalties disproportionately impact African Americans, the penalties violate equal protection and due process.

We are not unsympathetic to the concerns Bullard articulates. As he acknowledges, however, "we have consistently sustained the constitutionality of sentencing disparity between cocaine base and cocaine powder based on an equal protection challenge, rejecting repeatedly the argument that [Bul-

---

[4]Through passage of the FSA, Congress has since amended § 841 by reducing, but not eliminating, these disparities in sentencing between crack and powder cocaine offenses. *See* Pub. L. No. 111-220, 124 Stat. 2372.

lard] now seeks to advance." *Id.* at 876-77 (collecting cases). Bullard asks us to reevaluate our precedent based on "15 years of additional data and findings concerning the disparity in punishment between crack and powder cocaine offenses." Appellant's Br. at 36. But a "panel of this court cannot overrule, explicitly or implicitly, the precedent set by a prior panel of this court. Only the Supreme Court or this court sitting en banc can do that." *United States v. Rivers*, 595 F.3d 558, 564 n.3 (4th Cir. 2010) (internal quotations omitted). Bullard has not identified any subsequent controlling precedent compelling the conclusion that our prior decisions upholding the sentencing disparities have been overruled. We must therefore conclude that the disparities between crack and cocaine sentences contained in 21 U.S.C. § 841 do not violate equal protection or due process.

C.

Bullard's final argument is that the FSA, which was signed into law August 3, 2010, during the pendency of his appeal, should be interpreted to apply retroactively, entitling him to resentencing. The FSA increased the quantity of crack cocaine necessary to trigger certain mandatory minimum sentences under 21 U.S.C. § 841(b)(1). *See* Pub. L. No. 111-220, 124 Stat. 2372 (amending, inter alia, 21 U.S.C. § 841). Under the previous version of § 841(b)(1), a defendant who, like Bullard, had been convicted of a prior felony drug offense, faced a mandatory minimum ten-year sentence for possession of at least five grams of crack cocaine, and a minimum twenty-year sentence for possession of at least fifty grams of crack cocaine. *See* 21 U.S.C. § 841(b)(1)(A)-(B) (2006). The FSA raised the amounts necessary to trigger these ten- and twenty-year mandatory minimum sentences from 5 grams to 28 grams, and 50 grams to 280 grams, respectively, such that those defendants convicted of possessing smaller amounts of crack cocaine now face shorter required sentences. *See* Pub. L. No. 111-220, 124 Stat. 2372.

We first take up the issue of whether Bullard has standing to assert this FSA claim. Finding that he does, we conclude that the claim fails on its merits, as there is no indication that Congress intended for the FSA to apply retroactively.

1.

Bullard's standing to assert the retroactivity of the FSA is not immediately apparent. Although the government did not raise the issue of standing, we address it under our independent obligation to satisfy ourselves of our jurisdiction. *See Dan River, Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1223 (4th Cir 1980) ("[W]hether raised or not, jurisdictional standing is an issue to be considered sua sponte by the court.").

Standing requires injury-in-fact, causation, and redressability. *McBurney v. Cuccinelli*, 616 F.3d 393, 402 (4th Cir. 2010). When a defendant seeks to challenge a sentencing statute, the inquiry focuses on whether the defendant's sentence might change if he prevailed on his statutory claim. If not, courts typically decline to recognize standing, as the defendant lacks any redressable injury. *See, e.g.*, *United States v. Gray*, 577 F.3d 947, 950-51 (8th Cir. 2009) (holding that the defendant lacked standing to challenge a statutory minimum sentence where the district court's sentence was not based on the challenged provision); *United States v. Johnson*, 886 F.2d 1120, 1122 (9th Cir. 1989) (finding that the defendants lacked standing to challenge the constitutionality of § 841(b)(1)(B)'s mandatory minimum because their sentences "were not affected by the mandatory minimum provision of the statute").

Bullard's potential standing problem arises because he was charged with possessing an amount of crack cocaine for which the mandatory minimum sentence remains unaffected by the FSA. Bullard pleaded guilty to Count Two of his indictment, which charged him with possessing 332 grams of crack cocaine—an amount that would confer a 20-year mini-

mum sentence under both the old and new versions of § 841(b)(1).

Bullard argues that he nevertheless has standing because the version of § 841(b)(1)(A) to which he pleaded guilty penalized possession of as little as 50 grams of crack. After close consideration, we are inclined to agree. Although his argument is not artfully elucidated, the logical extension to Bullard's point that he pleaded to a statute that criminalized only 50 grams is that if he were granted resentencing, he could still raise a challenge to the quantity of drugs attributed to him above 50 grams, for sentencing purposes. Even after pleading guilty, a defendant retains the right during sentencing to challenge alleged drug quantities for sentencing purposes. *See United States v. Gilliam*, 987 F.2d 1009, 1013 (4th Cir. 1993).

Of course, certain admissions made by a defendant during his guilty plea might foreclose his ability to mount a viable challenge at sentencing to the quantity of drugs he possessed. For example, we have explained that the government can meet its burden of proving quantity at sentencing through pointing to "a defendant's acknowledgment during the Rule 11 colloquy or sentencing proceedings that the amount set forth in the indictment or alleged by the Government is correct." *Id.* Similarly, if a defendant pleads guilty to an indictment that charges him with a specific quantity of drugs "without reserving his right to challenge the amount for sentencing purposes," the court may find "that the alleged quantity should in fact be attributed." *Id.* at 1013 & n.3.

In the instant case, however, we believe there might be some room for Bullard to challenge the quantity of drugs attributable to him. At some places in Bullard's plea agreement and in his plea colloquy, Bullard appears to admit to having possessed the full 332 grams charged in his indictment. For example, at his plea hearing, the district court observed that Bullard was "pleading guilty to Count Two . . .

[involving] approximately 332 grams," just before Bullard entered his guilty plea to that count. J.A. 199. However, Bullard's plea agreement and plea colloquy also both contain explicit acknowledgements by Bullard that he "agrees that the substance involved in the offense alleged in Count Two of the Indictment for which he is accountable *is at least 50 grams* of a mixture and substance containing a detectable amount of cocaine base ('crack')." J.A. 173 (emphasis added); *see also* J.A. 200. On this record, Bullard might contest at resentencing whether he affirmatively admitted to possession of 332 grams, or should be found instead to have possessed some amount less than 280 grams, which would entitle him to a lower minimum sentence under the FSA.

Accordingly, if Bullard were to prevail on his argument that the FSA applies retroactively, he might ultimately succeed in obtaining a lesser sentence under the FSA. For this reason, we find that Bullard has standing to assert this claim.

2.

Having satisfied ourselves of our jurisdiction to hear Bullard's claim, we turn to its merits. Bullard contends that the FSA should be interpreted to apply retroactively to cases pending on direct appeal. The government responds that application of the General Savings Statute (the "Savings Statute"), 1 U.S.C. § 109, bars the FSA's retroactive application. We agree and join all of our sister circuits to have addressed the issue in holding that the Savings Statute does indeed preclude retroactive application of the FSA.

The Savings Statute provides:

> The repeal of any statute shall not have the effect to release or extinguish any penalty . . . incurred under such statute, unless the repealing Act shall so *expressly provide*, and such statute shall be treated as still remaining in force for the purpose of sustaining

any proper action or prosecution for the enforcement of such penalty . . . .

1 U.S.C. § 109 (emphasis added). This rule fully applies in the sentencing context and bars "application of ameliorative criminal sentencing laws repealing harsher ones in force at the time of the commission of an offense," absent an express statement that the law is intended to be applied retroactively. *Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 661 (1974). We agree with all eight circuits that have ruled on the issue that the FSA contains no express statement of retroactivity, nor can any such intent be inferred from its language. *See United States v. Doggins*, 633 F.3d 379, 384 (5th Cir. 2011); *United States v. Reevey*, 631 F.3d 110, 114-15 (3d Cir. 2010); *United States v. Diaz*, 627 F.3d 930, 931 (2d Cir. 2010) (per curiam); *United States v. Gomes*, 621 F.3d 1343, 1346 (11th Cir. 2010); *United States v. Bell*, 624 F.3d 803, 814-15 (7th Cir. 2010); *United States v. Carradine*, 621 F.3d 575, 580 (6th Cir. 2010); *United States v. Lewis*, 625 F.3d 1224, 1228 (10th Cir. 2010); *United States v. Brewer*, 624 F.3d 900, 909 n.7 (8th Cir. 2010).

Bullard argues that Congress's instruction in the FSA to the Sentencing Commission to "promulgate the guidelines, policy statements, or amendments provided for in this Act as soon as practicable . . . ," Pub. L. No. 111-220, evinces its intent to have the law apply retroactively. We disagree. Congress's desire to have the FSA implemented quickly in no way suggests that it also intended to have the Act apply retroactively to defendants sentenced before it was passed.[5] Congress knows how to explicitly provide for retroactive application when it so desires. *See, e.g.*, *Velasquez-Gabriel v. Crocetti*, 263 F.3d 102, 106-07 (4th Cir. 2001) (collecting certain statu-

---

[5]We do not address the issue of whether the FSA could be found to apply to defendants whose offenses were committed before August 3, 2010, but who have not yet been sentenced, as that question is not presented here.

tory provisions that Congress expressly stated should be applied retroactively).

Bullard also argues that the Savings Statute should not apply here, as by its terms it applies only to the "repeal" of a statute, not to an amendment. But we have squarely held that "although § 109 specifically refers only to repealed statutes, it also applies to statutes changed by amendment." *Korshin v. C.I.R.*, 91 F.3d 670, 673 n.5 (4th Cir. 1996). We find similarly unpersuasive Bullard's argument that the FSA is a "remedial," "error-correcting statute" that can apply on direct review even if not explicitly made retroactive. *See* Appellant's Supp. Br. at 7; Rep. Br. at 14. The "error-correcting" exception to the Savings Statute is a "narrow" one, confined to those situations where a "provision . . . must be read to apply to pending cases because a contrary reading would render it ineffective." *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 311 (1994) (internal quotations omitted). The FSA plainly will not be rendered ineffective if it applies only prospectively. Moreover, as the government persuasively points out, every statutory amendment corrects what has come to be perceived by Congress as an "error," such that a broad exception to the Savings Statute on this ground would swallow the rule.

For these reasons, we hold that the FSA does not apply retroactively and reject Bullard's claim that he is entitled to resentencing.

### III.

The judgment of the district court is hereby

*AFFIRMED*.