**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 13-4806**

_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

ROBERT ALLEN HILL,

Defendant – Appellant.

_____

**No. 13-4811**

_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

ERIC SCOTT BARKER,

Defendant – Appellant.

_____

**No. 13-4820**

_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

MEGAN EILEEN DUNIGAN,

Defendant – Appellant.

_____

Appeals from the United States District Court for the Northern District of West Virginia, at Clarksburg. Irene M. Keeley, District Judge. (1:13-cr-00018-IMK-JSK-3; 1:13-cr-00018-IMK-JSK-1; 1:13-cr-00018-IMK-JSK-2)

_____

Argued: September 19, 2014          Decided: January 13, 2015

_____

Before DIAZ and THACKER, Circuit Judges, and Paul W. GRIMM, United States District Judge for the District of Maryland, sitting by designation.

_____

Vacated and remanded by published opinion. Judge Diaz wrote the opinion, in which Judge Thacker and Judge Grimm joined.

_____

**ARGUED:** Andrew Brooks Greenlee, BROWNSTONE, P.A., Winter Park, Florida; Brian Joseph Kornbrath, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Clarksburg, West Virginia; David I. Schoen, DAVID I. SCHOEN, ATTORNEY AT LAW, Montgomery, Alabama, for Appellants. Shawn Angus Morgan, OFFICE OF THE UNITED STATES ATTORNEY, Clarksburg, West Virginia, for Appellee. **ON BRIEF:** Roger D. Curry, CURRY, AMOS, AND ASSOCIATES, Fairmont, West Virginia, for Appellant Megan Dunigan. William J. Ihlenfeld, II, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

_____

DIAZ, Circuit Judge:

We consider here the scope of Fourth Amendment protections as applied to individuals on federal supervised release. In February 2013, Eric Barker was serving a term of supervised release in connection with a felony drug conviction. His conditions of supervised release required him, among other things, (1) to notify his probation officer if he moved and (2) to permit probation officers to visit him at home at any time and confiscate contraband in plain view.

Law enforcement officials suspected Barker of moving without notification, obtained a warrant for his arrest, and executed it at his new home. Inside, they found Barker and two other individuals also on supervised release. After the officers had all three in custody and had completed their protective sweep, they conducted a walk-through of the apartment to look for contraband and other evidence of supervised release violations. Officers then had a drug-detection dog sniff around the apartment. Only after the dog alerted did the officers seek a search warrant.

The defendants contend that the walk-through and dog sniff violated the Fourth Amendment. Our precedent required the officers in this situation to have a search warrant rather than merely reasonable suspicion to search Barker's home. Accordingly, we hold that the walk-through and dog sniff were

3

unlawful searches. We also reject the government's contention that the good-faith exception applies with respect to the evidence seized as a result of the dog sniff. Finally, we vacate the judgments and remand for the district court to properly consider whether, pursuant to the "independent source" doctrine, the officers in this case "'would have sought a warrant' even if they had not conducted the unlawful search[es]." United States v. Bullard, 645 F.3d 237, 244 (4th Cir. 2011) (quoting Murray v. United States, 487 U.S. 533, 543 (1988)).

I.

A.

In late January 2013, Officer Vincent Zummo, Barker's probation officer, received a tip from a confidential informant that Barker had moved without notifying him. On February 8, 2013, a magistrate judge issued an arrest warrant for Barker for violating the conditions of his supervised release. Deputy U.S. Marshal Terry Moore assembled a ten-member team to execute the warrant. The team included deputy marshals, local drug task force officers, and the Chief U.S. Probation Officer. They met Zummo at Barker's new residence, a two-story house with a ground-floor apartment and an upstairs apartment. An officer knocked on the door, and a marshal announced the team's identity

4

and purpose. The landlady answered and said "Eric lives upstairs." Zummo and the Chief Probation Officer stayed downstairs. The rest of the team filed up the stairs.

At the top, Moore opened the bathroom door. He saw Barker inside, ordered him to lie down, and handcuffed and arrested him.[1] Team members then fanned out to conduct a protective sweep. A deputy marshal went left, forced open a locked bedroom door, and found Megan Dunigan hiding behind a bed. An officer went right, entered a second bedroom, and found Robert Hill inside. Dunigan and Hill were both handcuffed. Zummo went upstairs and identified them as also on supervised release. He then called the magistrate judge to tell him that, besides Barker, the officers had found two others in violation of their supervised release conditions. Dunigan and Hill were arrested.

During the protective sweep, the officers saw needles in the bathroom, a homemade tourniquet on Barker's arm, pills on the locked bedroom's dresser, packaging for synthetic marijuana on the kitchen table, and drug paraphernalia on the second bedroom's dresser.

After Barker, Dunigan, and Hill were arrested and the protective sweep had ended, Zummo and other arrest team members conducted a walk-through of the apartment looking for other

---

[1] Moore searched Barker and found more than $1,000 on his person.

5

evidence of supervised release violations. They looked "[o]n top of cabinets, on top of the bed, [and] in the closet" of the second bedroom. J.A. 118. Officers found scales, wax paper, and black electrical tape in the living room. Zummo seized cell phones and an intravenous drug use kit containing needles, cotton balls, and spoons from on top of the bathroom sink. After the walk-through, Zummo requested that a trained drug-detection dog come to the apartment.

About fifteen to twenty minutes later, the dog and his handler arrived. The dog alerted positively in many places. In the bathroom, the dog alerted "high," meaning that he smelled the odor of narcotics above his reach. That alert led officers to an out-of-place ceiling tile, where they saw a plastic bag tucked inside the ceiling.

At that point, the officers stopped the search and secured the apartment. Task Force Agent Robert Root, an arrest team member, applied for and obtained a warrant to search the apartment. Root's accompanying affidavit detailed his law enforcement experience; the circumstances of the arrest warrant execution, protective sweep, and walk-through; the contraband and paraphernalia discovered during those activities; and the drug dog alerts. The officers' subsequent search pursuant to the warrant turned up packaged and unpackaged heroin,

6

prescription pills, suspected LSD, synthetic marijuana, and drug use paraphernalia.

B.

The defendants were charged with conspiracy to possess with intent to distribute heroin, aiding and abetting possession with intent to distribute heroin, and aiding and abetting the maintenance of a drug-involved residence. They filed motions to suppress evidence challenging the lawfulness of the arrest warrant execution, protective sweep, walk-through, dog sniff, and the search warrant's validity. They also sought to exclude evidence found during the execution of the search warrant as fruit of the poisonous tree.

At the suppression hearing, the government conceded that the defendants had standing to press their Fourth Amendment challenges, either because they lived in the apartment (in the case of Barker and Dunigan) or stayed there as an overnight guest (in the case of Hill). The magistrate judge took judicial notice of the defendants' supervised release terms, which included Standard Condition of Supervision No. 10 requiring each defendant to "permit a Probation Officer to visit him or her at any time, at home or elsewhere, and [to] permit confiscation of any contraband observed in plain view of the Probation Officer." J.A. 124. The magistrate judge recommended denying the motions to suppress.

7

The district court adopted the magistrate judge's report and recommendation. For the walk-through and dog sniff, the district court applied a reasonable suspicion standard and found that both searches met it. The court relied on United States v. Knights, 534 U.S. 112 (2001), which upheld as reasonable a warrantless search of a probationer's home when officers had reasonable suspicion and the probationer had agreed to a probation condition allowing warrantless home searches. The court reasoned that, like in Knights, Barker's supervision condition allowing his probation officer to visit him at home at any time diminished his expectation of privacy to the point where officers needed only reasonable suspicion, not a warrant, for the walk-through and dog sniff. The district court also applied United States v. Karo, 468 U.S. 705 (1984), to conclude that sufficient untainted evidence established probable cause to support the search warrant, even if the walk-through and dog sniff were illegal and their results were excised from the warrant application.[2]

The defendants entered conditional guilty pleas to aiding and abetting possession with intent to distribute heroin and preserved the right to appeal the denial of their suppression

---

[2] The district court also found the arrest warrant execution and protective sweep lawful, conclusions that the defendants have not appealed.

motions.  The district court sentenced Barker to 151 months in prison, Dunigan to 18 months, and Hill to 27 months.  The court also imposed three years' supervised release on each of them. Special Condition of Supervision No. 6 will require the defendants to submit to warrantless searches of their persons, property, residences, or vehicles based on a probation officer's reasonable suspicion.

## II.

### A.

When considering a motion to suppress, we review de novo the district court's legal conclusions.  United States v. Williams, 740 F.3d 308, 311 (4th Cir. 2014).  In its brief, the government frames its arguments in terms of clear error, which we use to evaluate the district court's factual findings.  Id. But because the parties do not dispute the facts, de novo review is proper.

### B.

The defendants contend that once the protective sweep of the apartment had ended, the officers needed a warrant to go any further.  The government responds that the defendants' supervised release status, including their supervision conditions, so diminished their expectation of privacy that

9

officers needed only reasonable suspicion to conduct the walk-through and dog sniff.  We agree with the defendants.

This case is remarkably similar to one we decided thirty-six years ago, United States v. Bradley, 571 F.2d 787 (4th Cir. 1978).  Bradley was on parole with a condition requiring that he "permit his Parole Officer to visit his home or place of employment."  571 F.2d at 788 (internal quotation marks and alterations omitted).  No parole condition required him to consent to searches.  Bradley's parole officer received a tip that he was violating a parole condition that prohibited him from having a firearm.  Acting on the tip, Bradley's parole officer went to the boarding house where Bradley lived, searched his room, and found a firearm.  Id.

We held that "a parole officer must secure a warrant prior to conducting a search of a parolee's place of residence even where, as a condition of parole, the parolee has consented to periodic and unannounced visits by the parole officer."  Id. at 789.  In reaching this conclusion, we recognized that "the governmental interest in supervision is great and the parolee's privacy interest is diminished."  Id.  We also noted "the special relationship between the parolee and his parole officer" and "society's interest in having the parolee closely and properly supervised."  Id. at 790.  However, we found that these

10

considerations did not excuse the parole officer from complying with the Fourth Amendment's warrant requirement.  Id.

As in Bradley, the defendants here agreed to home visits by a probation officer but not warrantless searches.  Unlike Bradley, however, the defendants also agreed that a probation officer could visit them "at any time" and confiscate contraband in plain view.  This, however, is a distinction without a difference, as the fact remains that the defendants, as in Bradley, did not consent to warrantless home searches as a condition of supervision.

Thus, Bradley controls the outcome here unless intervening case law from our court sitting en banc or the Supreme Court has explicitly or implicitly overruled it.  Bullard, 645 F.3d at 246.  Since Bradley, the Supreme Court has decided three cases dealing with the privacy interests of individuals on probation or parole.  None calls into question Bradley's core holding.

In Griffin v. Wisconsin, 483 U.S. 868, 870-71 (1987), the Court considered whether a probation condition applicable to all Wisconsin probationers via state regulations comported with the Fourth Amendment when it allowed a probation officer to search a probationer's home without a warrant if the officer had reasonable grounds to believe that contraband was present.  The Court upheld the condition under the "special needs" exception to the warrant requirement.  483 U.S. at 873-80.  Notably,

11

however, the Court confined its decision to the facts before it (a warrantless search pursuant to an express regulation authorizing the same) and declined to approve all searches of a probationer's home predicated solely on reasonable suspicion. Id. at 872, 880. In short, the Court did not reach the question we decided in Bradley, namely, whether a parole officer may search a parolee's home without a warrant when no regulation or individual parole condition allows it.

In United States v. Knights, 534 U.S. 112, 114 (2001), the defendant was on probation subject to a condition that he submit to searches of his person, property, residence, or vehicle "with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." The Court held that a probation officer with reasonable suspicion could search a probationer's residence without a warrant when the probationer had agreed to a warrantless search condition. 534 U.S. at 118. Importantly, the Court found the search reasonable under the totality of the circumstances, "with the probation search condition being a salient circumstance." Id.

To determine the search's reasonableness, the Court balanced the privacy intrusion against the government's need to conduct the search to promote its legitimate interests. Relevant to both was Knights's "status as a probationer subject to a search condition." Id. at 119. On the intrusion side, the

12

Court concluded that "[t]he probation condition . . . significantly diminished Knights'[s] reasonable expectation of privacy." Id. at 119-20. On the need side, the Court identified the government's interest in monitoring probationers closely because of their greater likelihood of committing a crime than the general population. Id. at 121. The Court held that "the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house." Id. (emphasis added).

In our view, however, the specific probation condition authorizing warrantless searches was critical to the Court's holding. Indeed, at the close of the opinion, the Court referenced the probation condition in holding "that the warrantless search of Knights, supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the Fourth Amendment." Id. at 122. The Court also underscored that the "probation order clearly expressed the search condition and Knights was unambiguously informed of it." Id. at 119. In contrast, the supervision condition to which the defendants agreed in this case required them to submit to a probation officer's visit and allowed an officer to confiscate contraband in plain view. But no condition authorized warrantless searches.

13

The last case in this trilogy, Samson v. California, 547 U.S. 843 (2006), also did not vitiate Bradley because, like Knights, it emphasized the parolees' notice of an express warrantless search condition. Samson involved a Fourth Amendment challenge to a California statute requiring every prisoner eligible for release on state parole to "agree in writing to be subject to" warrantless searches by parole or peace officers "at any time of the day or night, . . . with or without cause." 547 U.S. at 846 (quoting Cal. Penal Code § 3067(a) (West 2000)). The Court held that "a condition of release can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment." Id. at 847. But as was the case in Knights, central to the Court's holding was the undisputed fact that the California parole condition had been "'clearly expressed' to [the] petitioner" and he was "'unambiguously' aware of it." Id. at 852 (quoting Knights, 534 U.S. at 119).

We are satisfied that Griffin, Knights, and Samson did not overrule our decision in Bradley.[3] Accordingly, Bradley remains

---

[3] The Fifth and Eleventh Circuits have taken a broader view of these cases. See United States v. Keith, 375 F.3d 346, 350 (5th Cir. 2004) (declining to read Knights or Griffin "as requiring either a written condition of probation or an explicit regulation permitting the search of a probationer's home on (Continued)

14

good law in our circuit, and thus law enforcement officers generally may not search the home of an individual on supervised release who is not subject to a warrantless search condition unless they have a warrant supported by probable cause.[4]  Here, the officers did not have a warrant when they conducted the walk-through and dog sniff, and those searches were therefore unlawful.

## III.

### A.

"The exclusionary rule generally renders inadmissible evidence recovered during an unlawful search."  United States v. Mowatt, 513 F.3d 395, 403 (4th Cir. 2008), abrogated in part by Kentucky v. King, 131 S. Ct. 1849 (2011).  In this case, the government makes two arguments against exclusion.  With respect to the dog sniff, the government contends that the officers relied in good faith on then-binding appellate precedent holding that a dog sniff was not a search.  Separately, the government urges that the "independent source" doctrine rescues from exclusion the evidence recovered during the walk-through and dog

reasonable suspicion");  United States v. Yuknavich, 419 F.3d 1302, 1310-11 (11th Cir. 2005) (same).  Of course, those circuits were writing on a clean state, while we are constrained by Bradley.

[4] The government in this case does not suggest that any other exception to the warrant requirement applies.

sniff because the officers later conducted a search of the apartment with a warrant.

As we explain, we disagree with the government's first argument, and remand the case to the district court for consideration of the second.

## B.

We first consider whether the officers relied in good faith on binding appellate precedent when they conducted the dog sniff. The government concedes that the dog sniff would have been an illegal search after the Supreme Court's recent decision in Florida v. Jardines, 133 S. Ct. 1409 (2013). But, says the government, the officers in this case relied in good faith on pre-Jardines precedent holding that a dog-sniff was not a search and therefore no warrant was required. As a result, the government contends, the good-faith exception saves the fruits of the now-illegal search from exclusion. We cannot agree.

"[S]earches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." Davis v. United States, 131 S. Ct. 2419, 2423-24 (2011). After the dog sniff in this case, the Supreme Court held in Jardines that a dog sniff of a home's curtilage "is a 'search' within the meaning of the Fourth Amendment." Jardines, 133 S. Ct. at 1417-18. Whether the Davis good-faith exception applies

16

depends on the "binding appellate precedent" that pre-dated Jardines.

The government points us to United States v. Jeffus, 22 F.3d 554 (4th Cir. 1994), as the relevant pre-Jardines precedent. Jeffus held that a dog sniff of a vehicle's exterior in a public place during a lawful traffic stop was not a search. 22 F.3d at 557. To reach that conclusion, we relied on United States v. Place, 462 U.S. 696, 707 (1983), where the Supreme Court found that a dog sniff of luggage in a public place was not a search.

According to the government, the officers reasonably relied on our Jeffus holding when they took a drug dog into the home of an individual on supervised release, without a warrant or consent. Jeffus, however, involved a dog sniff of the outside of a vehicle, not the inside of a home. We have not found, and the government does not cite to, any pre-Jardines case decided by the Supreme Court or this circuit that approved of a warrantless dog sniff inside a home.

The defendants draw our attention to United States v. Whitehead, 849 F.2d 849 (4th Cir. 1988), abrogated on other grounds by Gozlon-Peretz v. United States, 498 U.S. 395 (1991), as the appropriate pre-Jardines precedent. Whitehead involved a warrantless dog sniff of a passenger train's sleeping compartment. We held that the sniff required reasonable

suspicion, not a warrant and probable cause, because occupants have lower expectations of privacy in their sleeping compartments than in their homes or hotel rooms. 849 F.2d at 853, 856-57.

Never did we say in Whitehead that the dog sniff was not a search. Instead, we noted that "when authorities bring a narcotics detection dog into an area in which the occupant enjoys an expectation of privacy, the [F]ourth [A]mendment extends to protect the owner against 'unreasonable' intrusions." Id. at 858. We made clear that "Place obviously did not sanction the indiscriminate, blanket use of trained dogs in all contexts." Id. at 857. Neither did Jeffus. Therefore, we conclude that the officers could not have reasonably relied on any binding appellate precedent when conducting the dog sniff in this case and that the Davis good-faith exception does not apply.

C.

We turn now to the government's claim that the independent source doctrine saves from exclusion the fruits of the searches in this case. This doctrine applies when a "search pursuant to [a] warrant was in fact a genuinely independent source of the information and tangible evidence" that would otherwise be subject to exclusion because they were found during an earlier unlawful search. Murray, 487 U.S. at 542. To find the search

18

with a warrant "genuinely independent," the unlawful search must not have affected (1) the officer's "decision to seek the warrant" or (2) the magistrate judge's "decision to issue [it]." Id.

The district court found that the magistrate judge would have issued the warrant absent the evidence from the illegal searches, but did not consider Murray's first prong that speaks to the officer's decision to seek it. The court cited Karo, 468 U.S. 705, and our decision in United States v. Allen, 631 F.3d 164 (4th Cir. 2011), to support its single-step analysis.

We find that the district court erred in not applying both Murray prongs. This case differs from Karo because the law enforcement officers there acted pursuant to a warrant at all times, whereas the officers in this case did not. In Karo, the officers first sought a warrant "authorizing the installation and monitoring of a beeper" in a can of ether before installing or monitoring the beeper. 468 U.S. at 708. Officers had a tip that the ether "was to be used to extract cocaine from clothing that had been imported into the United States." Id. Using their results from visual and beeper surveillance, officers then applied for a search warrant for a residence where the can of ether was stored. Id. at 710. The district court later found the beeper warrant invalid. Id. But because the government did not appeal that finding, the reviewing courts treated the

installation and monitoring of the beeper as if conducted without a warrant. Id. at 711; United States v. Karo, 710 F.2d 1433, 1436 (10th Cir. 1983), reversed by Karo, 468 U.S. 705.

This situation left the government arguing that no warrant was needed for the beeper installation and monitoring despite the fact that the officers had indeed sought a warrant for those activities. Karo, 468 U.S. at 711. The Supreme Court agreed that a warrant was unnecessary to install a beeper, but held that a warrant was necessary to monitor the beeper inside a residence. Id. at 713-14. However, the Court found suppression unnecessary because "sufficient untainted evidence" in the search warrant affidavit established probable cause. Id. at 719, 721.

Here, the officers conducted the walk-through and dog sniff before seeking a search warrant. Although the officers had an arrest warrant, the government has not argued--nor could it-- that the walk-through and dog sniff fell within the arrest warrant's scope. Murray thus presents a better fit than Karo on the facts before us. The agents in Murray first forced entry into a warehouse without a warrant, and then sought a search warrant for the warehouse. 487 U.S. at 535-36. Unlike Karo, the sequence of events in Murray raised a question as to whether "the agents' decision to seek the warrant was prompted by what

they had seen during the [illegal] entry." Id. at 542. The record here raises similar questions.

We recognize that the district court relied on one of our post-Murray cases, Allen, that employed Karo's single-prong test. However, like the Supreme Court in Karo, we had no occasion in Allen to consider the officers' decision to seek a warrant. The officers in Allen, responding to a call about a firefight, saw "twenty spent shell casings," and "several blood trails, one of which led directly into" a store. 631 F.3d at 167. Before seeking a search warrant, an officer followed the blood trail into the store, saw that it led to a filing cabinet, opened a cabinet drawer, and found a revolver inside. Id. On these facts, there was no doubt (and Allen did not contest) that officers would have sought a search warrant for the store into which a blood trail led, even without the officer's unlawful search of the filing cabinet.[5]

But where the facts call into question whether an illegal search affected an officer's decision to seek a warrant, the district court should consider both Murray prongs when evaluating whether the independent source doctrine applies.

---

[5] Likewise, in two other published, post-Murray cases, we had no reason to question whether earlier illegal activity prompted the officer's decision to seek a warrant because the defendants did not contest it. See United States v. Moses, 540 F.3d 263, 268 (4th Cir. 2008); United States v. Gillenwaters, 890 F.2d 679, 681–82 (4th Cir. 1989).

21

See, e.g., Bullard, 645 F.3d at 244-45; United States v. Walton, 56 F.3d 551, 554 (4th Cir. 1995).

D.

The district court found that the unlawful walk-through and dog sniff did not affect the magistrate judge's decision to issue the warrant, and the defendants have not challenged this finding. The defendants, however, contend that Officer Root's suppression hearing testimony shows that the unlawful searches influenced his decision to seek a warrant. In particular, the defendants rely on two exchanges in the record. The first occurred during Root's direct examination:

> Q: Do you know at what point you decided to seek a search warrant?
>
> A: With all the paraphernalia that was seen inside the residence, the empty packaging of the synthetic marijuana, and the alert by the dog in multiple areas of the residence. At that point we decided to get a search warrant.

J.A. 92 (emphasis added). The second happened during cross-examination:

> Q: Who made the decision to apply to the Court for a search warrant?
>
> A: I did.
>
> Q: And at what point did you make that decision? Before the drug dog was there and it sniffed, or after the drug dog was there and it sniffed?
>
> A: It was after.

J.A. 96.

22

In addition to the two passages above, the government asked Root, "Did you plan that day [of the arrest] to obtain a search warrant?" He responded, "No, I didn't." J.A. 86. The government and Root also had the following exchange:

Q: How long were you there [at the apartment] before you decided to seek a search warrant?

A: We had the canine come through. We had been there probably 15 minutes, at least, with all the phone calls that were made, and arrangements being made to transport the defendants.

J.A. 91-92. Later on, the district court questioned Root about the sequence of events. After recapping the walk-through, the court asked, "What did you next do?" Root replied, "After that, when we called for the canine, the canine did a search of the residence. After the search of the residence, I called U.S. Attorney Shawn Morgan and decided to apply for a search warrant." J.A. 118.

The government interprets Root's testimony as merely stating a fact, i.e., that he did not seek the warrant until after the dog sniff, not as describing what Root would have done had the illegal searches never happened. We also note that Root had seen considerable drug paraphernalia in plain view[6] before the officers conducted the walk-through and dog sniff, thus

---

[6] Not least of which was a homemade tourniquet dangling from Barker's arm.

supporting the view that Root would have sought a warrant even if the officers had not conducted the unlawful searches.

We decline to resolve this factual question on appeal. Rather, we think it best for the district court to consider the issue in the first instance. See Murray, 487 U.S. at 543-44 (remanding for the district court to make a finding on the officer's decision prong of the analysis because "it is the function of the District Court rather than the Court of Appeals to determine the facts"); United States v. Campbell, 945 F.2d 713, 716 (4th Cir. 1991) (remanding for the district court to make factual findings related to the independent source doctrine's applicability).

IV.

For the foregoing reasons, we vacate the judgments and remand to the district court to determine whether the information gained from the illegal walk-through and dog sniff affected Officer Root's decision to seek a warrant.

VACATED AND REMANDED