**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-4029**

UNITED STATES OF AMERICA,

                Plaintiff – Appellee,

        v.

MARIO MARQUISE TAYLOR,

                Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Max O. Cogburn, Jr., District Judge.  (3:13-cr-00253-MOC-1)

Argued:  January 28, 2016                Decided:  March 15, 2016

Before TRAXLER, Chief Judge, and AGEE and WYNN, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:**  Ann Loraine Hester, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:** Ross Hall Richardson, Executive Director, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant.  Jill Westmoreland Rose, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Mario Marquise Taylor was charged with being a felon in possession of a firearm after officers found a gun near a car in which Taylor was a passenger. The DNA on the gun matched Taylor's. He moved to suppress evidence of his identity obtained during the encounter with police, arguing that the officers lacked reasonable suspicion to stop and question the car's occupants. The district court denied Taylor's motion in a decision that Taylor now appeals. For the reasons explained below, we affirm the judgment of the district court.

## I. Background

Officers Aaron Skipper and Todd Watson were patrolling on their motorcycles on November 26, 2012, investigating an area of Charlotte, North Carolina, where a burglary was recently reported. The officers saw Taylor, Preston Fields, and Marquise Randolph pass by in a blue Crown Victoria. The officers noted that the men "either look[ed] away or look[ed] down" as they drove past. J.A. 120. Finding this suspicious, the officers turned to follow the car, which rounded a bend and accelerated from approximately 35 to 50 miles per hour. The car then "turned into a driveway in an abrupt motion," braking quickly such that it "nose dived." J.A. 450.

2

As the officers approached, they saw that Taylor's passenger side window was rolled down and his hand was extended outside the car, despite the "very cool" temperature. J.A. 97. They drove past the Crown Victoria and parked in a field on the opposite side of the street, 60 to 75 feet away. From there, the officers watched Fields get out of the car and knock on the front door of the house adjoining the driveway where he had parked. No one answered, and Fields returned to the car.

After observing the three men sit in the car for about 45 seconds without moving, the officers pulled their motorcycles into a gravel area beside the driveway, about 20 feet behind the rear left of the Crown Victoria. Officer Skipper approached to question the driver, while Watson remained about 15 to 20 feet behind the car and off to the side, so that he could keep an eye on the scene.

Officer Skipper asked Fields if anyone was home, and Fields explained that he and his companions had come to meet someone there but that no one answered. Skipper asked if anyone had an ID, and Fields handed over his ID while Taylor and Randolph gave their names. Skipper proceeded to question the men and conduct consensual searches, finding no drugs or weapons.

Meanwhile, Officer Watson received a call from dispatch that a bus passenger had seen a firearm lying in the grass near where two motorcycle officers were talking with some men. Upon

3

investigation, Watson found a loaded Taurus .38 caliber revolver in the grass, about 75 feet away from the Crown Victoria, which had passed the spot before parking. The gun was on the side of the road Taylor's window had faced.

DNA analysis showed DNA of at least three people on the gun's grip, with one strong profile considered a "partial major" profile. J.A. 548. The partial major profile was later matched to a DNA sample from Taylor that was previously obtained and on file.

A federal grand jury returned an indictment against Taylor, charging him with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Taylor unsuccessfully moved to suppress evidence of his identity obtained during his encounter with Officers Skipper and Watson. Following a trial, the jury returned a guilty verdict, and the district court sentenced Taylor to 54 months' imprisonment.

Taylor timely appealed, and we have jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## II. Discussion

### A.

Taylor's primary argument on appeal is that the district court erred in denying the motion to suppress evidence of his identity. In his view, the court should not have concluded that

4

Officers Skipper and Watson had reasonable suspicion to initiate the stop that led to their obtaining Taylor's identity.

We review factual findings underlying the denial of a motion to suppress for clear error and legal determinations de novo. United States v. Hill, 776 F.3d 243, 247 (4th Cir. 2015). Because the district court denied Taylor's motion, we construe the evidence in the light most favorable to the government. United States v. Green, 740 F.3d 275, 277 (4th Cir. 2014). We "accord particular deference to a district court's credibility determinations," because of "the district court's role of observing the witnesses and of weighing their credibility." United States v. Hilton, 701 F.3d 959, 964 (4th Cir. 2012).

Under the Fourth Amendment, "an investigatory detention of a citizen by an officer must be supported by reasonable articulable suspicion that the individual is engaged in criminal activity." United States v. Black, 707 F.3d 531, 537 (4th Cir. 2013) (citing Terry v. Ohio, 392 U.S. 1, 21 (1967)). Here, we assume without deciding that the encounter constituted "an investigatory detention" -- or, in other words, a "seizure" -- and we move directly to the issue of whether the officers acted on a reasonable suspicion.

In assessing reasonable suspicion, we "look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for

5

suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). An "inchoate and unparticularized suspicion or hunch" is insufficient. United States v. Foster, 634 F.3d 243, 246 (4th Cir. 2011). Still, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." Arvizu, 534 U.S. at 274. Factors to be considered include "the context of the stop, the crime rate in the area, and the nervous or evasive behavior of the suspect." United States v. George, 732 F.3d 296, 299 (4th Cir. 2013).

Here, a number of factors would have given an officer an objective basis to suspect that the men in the Crown Victoria were up to some illegal activity. As the district court noted, the officers saw the men avert their eyes, away both from the officers and from where on the road the officers testified a normal person would have been looking while driving. This conduct would have immediately aroused some level of suspicion, given that the officers were investigating a recent burglary. At that point, the officers may yet have lacked reasonable suspicion, but the Crown Victoria proceeded in a matter that erased that doubt. That is, after passing the officers, the driver accelerated rapidly from around 35 to 50 miles per hour, seemed to speed up even more when out of sight, and then turned

"abrupt[ly]" to "nose dive[]" into a driveway. J.A. 450. An objective officer could view that manner of driving as an attempt to get off the road and hide -- an inference that is further supported by the fact that no one responded when Fields knocked on the front door of the house. The overall sequence of apparently evasive conduct provided Officers Skipper and Watson with reasonable suspicion to initiate the brief encounter that led to the evidence of Taylor's identity.* The district court did not err in denying Taylor's motion to dismiss.

B.

Taylor raises two additional issues on appeal that we likewise find unpersuasive. First, he asserts that, contrary to Batson v. Kentucky, 476 U.S. 79 (1986), the government had a racially discriminatory purpose for using a preemptory strike against the only remaining black juror, Ms. Robinson. At trial, the government had explained that Ms. Robinson had a "meek voice" and "hearing issues," "look[ed] lost in the courtroom, with a lost look in her eyes," and when asked a follow-up

---

* Two additional factors the district court cited -- the open window and the delay in leaving the driveway after knocking on the door -- are more ambiguous. While neither of these factors is particularly indicative of criminal activity standing alone, they could conceivably bolster the officers' suspicion when considered as part of the "totality of the circumstances." Arvizu, 534 U.S. at 273. All the same, the circumstances noted above adequately establish reasonable suspicion such that we need not rely on these other factors.

7

question about guns, "could not explain why and would not explain why, and would not make eye contact." J.A. 335-36. The district court accepted this race-neutral explanation and consequently found that that Taylor had not "established purposeful discrimination," as is required for a defendant to prevail on a Batson challenge. 476 U.S. at 98.

We review a district court's finding regarding a Batson challenge for clear error. Jones v. Plaster, 57 F.3d 417, 421 (4th Cir. 1995). Because findings on the issue of discriminatory intent "largely will turn on evaluation of credibility," Batson, 476 U.S. at 98 n.21, we accord the district court's decision "great deference on appeal." Hernandez v. New York, 500 U.S. 352, 364 (1991).

Here, that deference leads us to find no error in the district court's decision to deny Taylor's Batson challenge. The court's own findings confirmed the government's stated rationale. The court agreed that Ms. Robinson was "somewhat distracted" and "much more uncomfortable than the rest of the folks on the panel." J.A. 338. Further, it explained that "[e]ye contact is a big thing" and that "the government's reasons for taking that juror off do ring true." J.A. 339-40. Taylor insists that the district court failed to conduct a "comparative juror analysis," see United States v. Barnette, 644 F.3d 192, 205 (4th Cir. 2011), but the district court made such

8

a finding: It stated unequivocally that the juror appeared "much more uncomfortable than the rest of the folks on the panel." J.A. 338.  Any potential deficiency in the district court's analysis falls far short of clear error.

Second, Taylor asserts that the district court erred in giving an instruction as to constructive possession of the firearm.  He contends that no evidence supported constructive possession -- as opposed to actual possession -- and that the instruction therefore may have confused the jury.  See United States v. Whittington, 26 F.3d 456, 463 (4th Cir. 1994) (stating that a jury instruction is proper "only if there is a foundation in evidence to support" it).  This Court reviews a district court's "decision to give or not to give a jury instruction . . . for an abuse of discretion."  United States v. Moye, 454 F.3d 390, 397-98 (4th Cir. 2006).

We find that the district court did not abuse its discretion by giving the constructive possession instruction. The record provides factual support for the instruction.  Given the possibility that someone other than Taylor threw the gun from the car, Taylor's DNA and position in the car could suggest he nonetheless had control over the gun.  See United States v. Blue, 957 F.2d 106, 107 (4th Cir. 1992) ("[T]o establish constructive possession, the government must produce evidence showing ownership, dominion, or control over the contraband

9

itself or the premises or vehicle in which the contraband is concealed."). As the district court observed, "If [the gun] was close enough for him to drop sweat on it, it had to be close enough for him that he could have constructively possessed it." J.A. 623. In any event, we are satisfied that any error would be harmless. See United States v. McCoy, 767 F.2d 395, 398 (7th Cir. 1985) (holding that a constructive possession instruction constituted harmless error). Taylor provides no reason to conclude that the constructive possession instruction, which was an accurate statement of law, would have confused the jury in its application of an actual possession theory. See Dawson v. United States, 702 F.3d 347, 350 (6th Cir. 2012) ("As in McCoy, the jury in Dawson's trial is unlikely to have been confused by the instruction.").

III.

For the foregoing reasons, the district court's judgment is

AFFIRMED.