In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 19-2469

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DUSTIN CAYA,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 18-cr-108-wmc — **William M. Conley**, *Judge*.

_____

ARGUED DECEMBER 2, 2019 — DECIDED APRIL 16, 2020

_____

Before BAUER, EASTERBROOK, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Dustin Caya was indicted on drug-trafficking and firearms charges based on evidence found in his home during a search conducted on the authority of section 302.113(7r) of the Wisconsin Statutes. The statute authorizes law-enforcement officers to search the person, home, or property of a criminal offender serving a term of "extended supervision"—the period of community supervi-

sion that follows a prison term—based on reasonable suspicion of criminal activity or a violation of supervision.

Caya moved to suppress the evidence recovered from his home, arguing that the search was unlawful under the Fourth Amendment. The district judge denied the motion. Caya pleaded guilty, reserving his right to challenge the suppression ruling on appeal.

We affirm the judgment. Fourth Amendment law has long recognized that criminal offenders on community supervision have significantly diminished expectations of privacy. More specifically, the privacy expectations of offenders on postimprisonment supervision are weak and substantially outweighed by the government's strong interest in preventing recidivism and safely reintegrating offenders into society. Indeed, the Supreme Court has held that a law-enforcement officer may search a person on parole without *any* suspicion of criminal activity. *Samson v. California*, 547 U.S. 843, 847 (2006). In Wisconsin extended supervision is essentially judge-imposed parole. It follows that a search under section 302.113(7r), which requires reasonable suspicion of criminal activity or a violation of supervision, is constitutionally permissible.

## I. Background

On June 1, 2018, police officers in Prairie du Chien, Wisconsin, were summoned to a local business to check on a woman who was passed out in her parked car. Arriving at about 1:15 p.m., the officers identified the woman as Melissa Thomas and called for paramedics to transport her to the hospital. While they were waiting for the ambulance, the officers found a methamphetamine pipe in the car and

suspected an overdose. They also noticed a child's car seat in the vehicle.

At the hospital Thomas was initially too incapacitated to respond to the officers' questions, so they returned later that afternoon after she was medically stabilized and more responsive. She told them that she had used methamphetamine in her car that day. When asked where she got the meth, she said that she and Dustin, her live-in boyfriend, obtained it together and shared it "as a family," but she was unsure of the original source. She told the officers that she kept her meth pipes at home. They asked about the car seat. She said she had two children, a one-year-old and a fourteen-year-old. She was initially confused about where they were and who was caring for them. She later said that the children were at home and Dustin was supposed to be looking after them. She gave the officers her home address, and they called in a request for a welfare check on the children.

Sergeant Todd Miller and Deputy Matthew Small of the Grant County Sheriff's Office were dispatched to Thomas's home. Caya answered the door. He was sweating profusely, speaking rapidly, and his pupils were constricted, suggesting that he was under the influence of drugs. Sergeant Miller was familiar with Caya from previous contacts with him. The sergeant also knew that Caya was on extended supervision for a felony conviction and therefore subject to section 302.113(7r). The statute, enacted in 2013 and colloquially referred to as Act 79, authorizes law-enforcement officers to search the person, home, or property of an offender released to extended supervision following a term of imprisonment if the officer has reasonable suspicion that the

offender is involved in criminal activity or is violating a condition of his supervision.

The officers asked Caya about Thomas. He said she was not home. He assured the officers that he and Thomas were clean and that Thomas's children were with their grandmother in Dubuque. Based on their observations and the information they had from Thomas, the officers initiated a search under the statute. They handcuffed Caya and did an initial sweep of the home, locating Thomas's one-year-old child in the living room and methamphetamine and loaded rifles in a bedroom. In a second, more thorough search, the officers recovered various items of drug paraphernalia, cash, several loaded rifles and handguns, and more than 350 grams of meth.

A federal grand jury indicted Caya for possessing methamphetamine with intent to distribute, possessing a firearm in furtherance of that crime, and possessing a firearm as a felon. He moved to suppress the evidence recovered from his home. He argued that warrantless searches under Act 79 are unreasonable in violation of the Fourth Amendment, and alternatively, that the officers lacked reasonable suspicion as required by the statute. The judge rejected these arguments and denied the motion. Caya later entered guilty pleas to the methamphetamine count and the charge of possessing a firearm as a felon; the remaining count was dismissed. The judge imposed concurrent terms of 78 months in prison.

## II. Discussion

Caya's plea agreement reserved his right to appeal the judge's suppression ruling. He no longer disputes the reasonable suspicion for the search. He focuses instead on his

more general challenge to Act 79 searches, arguing that the Fourth Amendment prohibits law-enforcement searches of persons on extended supervision based on mere reasonable suspicion of criminal activity.

This argument requires a bit of background on the relevant aspects of state sentencing law. Effective December 31, 1999, Wisconsin eliminated its old system of indeterminate sentencing, which gave the executive branch the discretion to release a prisoner to parole supervision prior to the expiration of his judicially imposed sentence. In its place the legislature installed a system of determinate sentencing that requires judges to impose bifurcated sentences with confinement and community-supervision components. WIS. STATS. § 973.01(1) (requiring bifurcated sentences); *id.* § 973.01(6) (abolishing parole). More specifically, a bifurcated sentence "consists of a term of confinement in prison followed by a term of extended supervision under s. 302.113," and "[t]he total length of a bifurcated sentence equals the length of the term of confinement in prison plus the length of the term of extended supervision." *Id.* § 973.01(2). Both the sentencing judge and the Department of Corrections may set the conditions of extended supervision. *Id.* § 973.01(5); *id.* § 302.113(7). An offender who violates a condition of extended supervision may be returned to prison for a period not to exceed the term of extended supervision minus any time served on earlier revocations of extended supervision. *Id.* § 302.113(9)(am).

Thirteen years later the legislature adopted 2013 Wisconsin Act 79, the provision at issue here. It provides, in relevant part:

> A person released [to extended supervision]
> under this section, his or her residence, and
> any property under his or her control may be
> searched by a law enforcement officer at any
> time during his or her period of supervision if
> the officer reasonably suspects that the person
> is committing, is about to commit, or has
> committed a crime or a violation of a condition
> of release to extended supervision.

*Id.* § 301.113(7r). The search of Caya's home was conducted under the authority conferred by this statute. He argues that the search was unlawful under principles extrapolated from a trilogy of Supreme Court cases addressing searches of offenders on community supervision.

First, in *Griffin v. Wisconsin*, 483 U.S. 868 (1987), the Court upheld as reasonable a probation officer's warrantless search of a Wisconsin probationer's home under a regulation permitting the officer to conduct a search on reasonable suspicion that the probationer possessed contraband. *Id.* at 870–71. The Court began by observing that "[a] probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be reasonable," which normally requires a warrant based on probable cause. *Id.* at 873 (quotation marks omitted). The Court determined, however, that the warrantless probation search was lawful under the special-needs exception, which applies when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Id.* (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, J. concurring)). The Court reasoned that adhering to the warrant requirement would interfere

with the probation system's substantial need to closely supervise and control the conduct of probationers in order to protect the community and promote genuine rehabilitation. *Id.* at 874–75.

Next, in *United States v. Knights*, 534 U.S. 112 (2001), the Court again upheld a warrantless search of a probationer's home, only this time by a law-enforcement officer. Because the search was conducted as part of a law-enforcement investigation rather than for probationary purposes, the special-needs doctrine did not apply. *Id.* at 118–19. The government urged the Court to uphold the search on a consent-based rationale, noting that the defendant had signed a court document acknowledging the conditions of his probation, including a condition subjecting him to warrantless law-enforcement searches. *Id.* at 118.

The Court declined that invitation and instead assessed the reasonableness of the search under its more general "totality of the circumstances" analysis, weighing the degree of intrusion on individual expectations of privacy against the degree to which the search "is needed for the promotion of legitimate governmental interests." *Id.* at 118–19 (quotation marks omitted). The Court opened with an observation that "probationers do not enjoy the absolute liberty to which every citizen is entitled." *Id.* at 119 (quotation marks omitted). The search condition, the Court explained, was clearly reasonable given the probationary goals of rehabilitation and community protection, and the probationer was unquestionably aware of it. *Id.* The Court had no trouble concluding that a probationer has a "significantly diminished" expectation of privacy. *Id.* at 119–20.

On the other side of the scale, the Court determined that the government's interests in this context are very strong: recidivism rates are high and probationers have a heightened incentive to conceal their criminal activity and destroy incriminating evidence in order to avoid revocation and imprisonment in truncated proceedings that do not carry the right to a jury trial and other procedural protections. *Id.* at 120. The public-safety concerns tipped the balance: the governmental interests outweighed the weak individual expectations of privacy. *Id.* at 121. The Court held that a law-enforcement officer may conduct a warrantless search of a probationer or his home or property if the search is "supported by reasonable suspicion and authorized by a condition of probation." *Id.* at 122.

Finally, in *Samson v. California*, the Supreme Court upheld a suspicionless law-enforcement search of a parolee. The search was conducted under a state law authorizing parole and law-enforcement officers to search parolees "with or without a search warrant and with or without cause." 547 U.S. at 846 (quotation marks omitted). While the analysis was quite similar to *Knights*, *Samson* went further. The Court reasoned that because parole is even closer to imprisonment than probation on the "continuum" of punishments, a parolee has a lower expectation of privacy than a probationer. *Id.* at 850. The Court also determined that the government has an "overwhelming interest" in tight supervision of parolees to reduce recidivism and promote reintegration into law-abiding society. *Id.* at 853–55. Considering the weakness of a parolee's privacy interests and the strength of the public-safety interests, the Court concluded that a statutorily authorized, suspicionless law-enforcement search of a parolee is reasonable under the Fourth Amendment.

*Samson* controls this case. Formally and practically, Wisconsin's extended-supervision system is parole by another name. Extended supervision is judicially imposed parole supervision—the second part of the bifurcated sentence imposed by the court. § 973.01(2). Just as parole is ultimately limited by the length of the prison term imposed by the court, the length of extended supervision is limited by the total length of the bifurcated sentence imposed by the judge. § 973.01(2)(a).

Because extended supervision in Wisconsin is judicially imposed parole, an offender on extended supervision has no greater expectation of privacy than a parolee. And Wisconsin's interest in rigorously monitoring offenders on extended supervision is just as compelling as the government's parole-supervision interests in *Samson*. If, as *Samson* holds, a no-suspicion search of a parolee is constitutionally permissible, so too an Act 79 search—predicated on reasonable suspicion—is constitutionally permissible.

Caya resists this conclusion, arguing that extended supervision is more like probation than parole. Not so, as we've explained. He also insists that *Knights* and *Samson*—the cases involving law-enforcement searches—were narrow, fact-bound decisions that entailed a particularized inquiry into whether the defendant had notice that he was subject to a warrantless search as a condition of his supervision. But neither decision rested on a consent rationale, either express or implied; indeed, *Samson* and *Knights* were crystal clear that consent was *not* a decisive consideration. *Samson*, 547 U.S. at 852 n.3 ("[W]e decline to rest our holding today on the consent rationale."); *Knights*, 534 U.S. at 118 ("We need not decide whether Knights' acceptance of the

search condition constituted consent … because we conclude that the search of Knights was reasonable under our general Fourth Amendment approach … .").

Last, Caya urges us to adopt the Fourth Circuit's reasoning in *United States v. Hill*, 776 F.3d 243 (4th Cir. 2015). There, the court held that a warrantless search of the home of three offenders on federal supervised release was unlawful. No release condition, regulation, or statute subjected the offenders to warrantless law-enforcement searches. *Id.* at 249. Instead, their release conditions subjected them only to visits by a probation officer and to confiscation of contraband in plain view. The Fourth Circuit suggested that the absence of prior authorization made *Griffin*, *Knights*, and *Samson* inapplicable. *Id.* As we've just explained, there is reason to doubt that understanding of the Court's decisions. But whatever the merits of the distinction drawn in *Hill*, Caya is on the wrong side of it. He concedes that section 302.113(7r) authorized the search of his home. The Fourth Circuit's decision does not help him.

The Act 79 search of Caya's home was not unconstitutional. The judge properly denied the suppression motion.

ALSO AFFIRMED

ALSO AFFIRMED